1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

FRANK CHARLES,

                Petitioner,

  vs.

T. FELKER, Warden,

                Respondent.

_____/

No. C 06-4568 PJH (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

     This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. § 2254.  The court ordered respondent to show cause why the writ should not be granted. Respondent has filed an answer and a memorandum of points and authorities, and has lodged exhibits with the court.  Petitioner has filed a traverse.  For the reasons set forth below, the petition is denied.

**BACKGROUND**

     On April 17, 2003, a jury found petitioner guilty of murder and attempted premeditated murder, *see* Cal. Penal Code § 187(a); §§ 187(a), 664 (a), and found that for each count petitioner was armed with a firearm, *see id.* at § 12022 (a)(1).  He was sentenced to prison for twenty-six years to life.  He unsuccessfully appealed his conviction to the California Court of Appeal, and the California Supreme Court denied his petition for review.  The Alameda County Superior Court, California Court of Appeal, and California Supreme Court each denied a petition for writ of habeas corpus.

///

1    Petitioner does not dispute the following facts, which were summarized by the

2  California Court of Appeal:

> In short, defendant, who was associated with the 65th Village neighborhood
> in Oakland, was charged and convicted of having attempted to kill Milton
> Peoples, who was associated with the nearby 71st Village neighborhood.   On
> August 8, 2002, according to the verdict, he shot (and paralyzed) Peoples
> and at the same time killed Michelle Horton, who was driving the car in which
> Peoples was riding.

6  Ex.  G at 2.

7                                      **STANDARD OF REVIEW**

8    A district court may not grant a petition challenging a state conviction or sentence on

9  the basis of a claim that was reviewed on the merits in state court unless the state court's

10  adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an

11  unreasonable application of, clearly established Federal law, as determined by the

12  Supreme Court of the United States; or (2) resulted in a decision that was based on an

13  unreasonable determination of the facts in light of the evidence presented in the State court

14  proceeding."  28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to

15  mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 407-09 (2000), while the

16  second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*,

17  537 U.S. 322, 340 (2003).

18    A state court decision is "contrary to" Supreme Court authority, that is, falls under the

19  first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that

20  reached by [the Supreme] Court on a question of law or if the state court decides a case

21  differently than [the Supreme] Court has on a set of materially indistinguishable facts."

22  *Williams (Terry)*, 529 U.S. at 412-13.  A state court decision is an "unreasonable application

23  of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly

24  identifies the governing legal principle from the Supreme Court's decisions but

25  "unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  The

26  federal court on habeas review may not issue the writ "simply because that court concludes

27  in its independent judgment that the relevant state-court decision applied clearly

28  established federal law erroneously or incorrectly."  *Id.* at 411.  Rather, the application must

United States District Court

For the Northern District of California

1   be "objectively unreasonable" to support granting the writ.  *Id.* at 409.

2          Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual

3   determination will not be overturned on factual grounds unless objectively unreasonable in

4   light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322 at

5   340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

6          When there is no reasoned opinion from the highest state court to consider the

7   petitioner's claims, the court looks to the last reasoned opinion. *See Ylst v. Nunnemaker*,

8   501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n.2 (9th Cir.

9   2000).

10                                    **DISCUSSION**

11         As grounds for habeas relief petitioner asserts that:  (1) The prosecution struck

12  jurors solely on account of their race, a violation of the Equal Protection Clause; (2) the

13  prosecutor misstated the law during closing argument and in doing so violated petitioner's

14  right to due process under the Fourteenth Amendment; and (3) he received ineffective

15  assistance of counsel in violation of his Sixth Amendment rights.

16  **I.      Racial Discrimination in Jury Selection**

17         Petitioner claims that the prosecutor used peremptory challenges to strike jurors

18  solely because they were African-American, in violation of the Equal Protection Clause.

19         **A.      Legal Standard**

20         The Equal Protection Clause forbids the challenging of potential jurors solely on

21  account of their race. *Batson v. Kentucky*, 476 U.S. 79, 89 (1986).  A party may raise an

22  equal protection claim on behalf of a juror excluded because of the juror's race, regardless

23  of whether the party and the excluded juror share the same race. *Powers v. Ohio*, 499 U.S.

24  400, 406 (1991).  Under *Batson*, a violation of equal protection is established in a

25  three-step process.  476 U.S. at 96-98.  First, the defendant must make a prima facie case

26  that the prosecutor exercised a peremptory challenge on the basis of race "by showing that

27  the totality of the relevant facts gives rise to an inference of discriminatory purpose."

28  *Batson*, 476 U.S. at 93-94.  Second, if the defendant makes a prima facie showing, the

**United States District Court**
For the Northern District of California

1   burden shifts to the prosecutor to articulate a race-neutral explanation for striking the juror

2   in question. *Id.* at 94.  Finally, if the prosecutor offers a race-neutral explanation for the

3   challenge, the court must determine whether, despite the prosecutor's proffered

4   explanation, the defendant has carried the burden of proving purposeful discrimination. *Id.*

5   at 97-98.  In doing so, the court evaluates the totality of the relevant facts. *Ali v. Hickman,*

6   571 F.3d 902, 908 (9th Cir. 2009).

7        The findings of the state trial court on the issue of discriminatory intent are findings

8   of fact entitled to the presumption of correctness in federal habeas review. *See Purkett v.*

9   *Elem*, 514 U.S. 765, 769 (1995).  So are the findings of the state appellate court. *See*

10  *Mitleider v. Hall*, 391 F.3d 1039, 1050 (9th Cir. 2004); *Williams v. Rhoades*, 354 F.3d 1101,

11  1108 (9th Cir. 2004).  The petitioner must show the state court's conclusion to be "an

12  unreasonable determination of the facts in light of the evidence presented in the state court

13  proceeding." *Id.* (citing 28 U.S.C. § 2254(d)(2)); *see also Kesser v. Cambra*, 465 F.3d 351,

14  368 (9th Cir. 2006) (finding that California Court of Appeal's conclusion that a strike was not

15  racially based was unreasonable determination under 28 U.S.C. § 2254(d)(2), and "even

16  satisfies the more demanding standard" of § 2254(e)(1)).  Therefore, a federal habeas

17  court can only grant habeas relief "if it was unreasonable to credit the prosecutor's

18  race-neutral explanations for the *Batson* challenge." *Rice v. Collins*, 546 U.S. 333, 338

19  (2006).

20       Petitioner's claim turns on the third step of the *Batson* analysis, with the minor

21  exception of the prosecutor's grounding one of his strikes in part upon a conclusion that a

22  prospective juror was "unkempt."  Neither party questions the trial court's conclusion that

23  petitioner established a prima facie case that the prosecutor exercised peremptory

24  challenges on the basis of race.  Furthermore, "[o]nce a prosecutor has offered a

25  race-neutral explanation for the peremptory challenges and the trial court has ruled on the

26  ultimate question of intentional discrimination," as is the case here with the exception

27  mentioned above, "the preliminary issue of whether the defendant had made a prima facie

28  showing becomes moot." *Hernandez*, 500 U.S. at 359.  Accordingly, this court's discussion

United States District Court

For the Northern District of California

1  is of petitioner's contentions that some of the prosecutor's proffered explanations for the

2  challenges were not race-neutral and that none of the prosecutor's explanations suffice to

3  overcome the inference of discriminatory intent or purpose established by the prima facie

4  showing.

5  **B.      General Matters**

6      The final jury contained two African-American women, and one African-American

7  man served as an alternate juror.  The prosecutor used ten of his twenty allowed strikes,

8  and five of these challenges were used on African-Americans.  Also, at the time the

9  defense's *Wheeler* motion was brought, eight African-Americans remained in the venire.

10  During the *Wheeler* motion, the prosecutor stated that the timing of the relevant peremptory

11  challenges arose primarily out of his attempt to get to the potentially pro-prosecution jurors

12  within the venire; the order in which jurors would be called was available to the lawyers

13  along with their questionnaires, and he said he was trying to reach individuals later in the

14  venire.  1 Ex. B at 76-77.

15  **C.      Michelle Taylor**

16      The prosecutor provided three reasons for his decision to strike Michelle Taylor.

17  First, he felt that due to her relatively recent arrival in the county, she might have weak ties

18  to the community and that she would therefore be neither as knowledgeable about nor as

19  invested in the affairs of Alameda County as jurors who have resided in Alameda for longer

20  periods of time.  1 Ex. B at 62.  The prosecutor said that "she only has minimal ties to this

21  community, may not be in touch with the community standards of Alameda County, may

22  not be able to relate to other jurors who have a much longer history in this county.  And I

23  think that ties to the community and ties to the county in which you're going to serve are

24  important." *Id.*

25      Second, the prosecutor felt that there was a high degree of instability in Taylor's life,

26  which raised "a red flag." 1 Ex. B at 63.  He felt that her explanation for her sudden move

27  from Memphis to Oakland was too sketchy, and that her frequent job changes were

28  characteristic of people who "may not be applying themselves, [or] may not get along with

United States District Court

For the Northern District of California

coworkers." *Id.* at 62-63.

Third, the prosecutor was concerned that Taylor's moral convictions might get in the way of her application of the law.  On her questionnaire, Taylor marked "Yes" next to the question asking whether any of her religious beliefs, moral feelings, personal views or philosophical principles would interfere with her ability to sit in judgment of another person, noting that "my morals I firmly stand on."  1 Ex. B at 64.  The prosecutor felt that he never got an adequate explanation of her response to this question, and stated that even when someone gets past a point where they will be dismissed for cause, he is wary of an initial response indicating a reticence to follow the law and an impulse to override legal rules with one's moral beliefs.  *Id.*  The prosecutor said that he did not want to take a risk with her because she could not articulate the reasons behind her initial answer.  *Id.*

The California Court of Appeal could find no reason in the record to deny deference to the trial court's finding that the prosecutor's reasons for this challenge were not pretextual.  Ex. G at 8.  In making this determination, however, the court of appeal declined to use comparative juror analysis.  *Id.*

Petitioner contends that the prosecution's second and third reasons for challenging Taylor were "implausible and/or contrary to the record."  Pet. Mem. 3.  However, the second step of the *Batson* analysis "does not demand an explanation that is persuasive, or even plausible."  *Purkett v. Elem,* 514 U.S. 765, 768 (1995).  Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral. *Id.*  Because no discriminatory intent is inherent in any of the prosecutor's proffered reasons for this challenge, he satisfied the step of providing a race-neutral explanation. Accordingly, the court will consider the totality of the facts, including a comparative juror analysis, to evaluate whether this explanation overcomes the inference of discrimination established by the prima facie case.

As petitioner points out, several jurors were not born in the United States.  Juror number eight had been in the United States fewer than ten years, and juror number twelve was born in East Germany, though she had lived in the United States for most of her life.

United States District Court

For the Northern District of California

1    The bare fact of birth in another country, however, does not provide a solid point of

2    comparison for the substance of the prosecutor's first reason for this challenge.  If both of

3    these jurors had been in the Alameda area for all or much of their time in the United States,

4    they would likely be more closely connected to the community than would be a recent

5    transplant to the area who happened to have been born in the United States.  On the other

6    hand, if these jurors had recently moved to Alameda, their lack of connection to the

7    community is likely to have been comparable to that of a U.S-born transplant (and the fact

8    of their foreign birth could be more or less relevant than their recent arrival depending upon

9    a number of other factors).  Unfortunately, information about these jurors' dates of arrival in

10   Alameda is not available in the record.  A comparative evaluation, then, cannot turn on this

11   reason.

12        The record of voir dire questioning does not indicate that the prosecutor's second

13   concern about Taylor – instability stemming from recent moves and frequent job changes –

14   is applicable to any of the selected jurors.  Furthermore, the concern that a venire-member

15   might not be able to work productively as a part of a jury is legitimate.  Accordingly, this

16   reason was not pretextual.

17        The prosecutor also challenged the only other person who raised, during voir dire,

18   the same concerns expressed in the third proffered reason for this challenge – an

19   undispelled sense that the venire-member's moral convictions might override the duty to sit

20   in judgment of another person and apply the law as given.  This issue did not arise during

21   voir dire for any person who sat on the jury.  Furthermore, the concern that a

22   venire-member might follow her own principles over the law is legitimate.  Accordingly, the

23   prosecutor's third reason for challenging Taylor was not pretextual, either.

24        The prosecutor's proffered race-neutral reasons for this challenge were not

25   pretextual, and so overcome the inference of discrimination established by the prima facie

26   case.  Accordingly, the Court of Appeal's rejection of the federal claim was not an

27   "unreasonable determination of the facts in light of the evidence presented."  28 U.S.C. §

28   2254(d)(2).

United States District Court

For the Northern District of California

### D.   Jackie Bohanon-McDaniels

The prosecutor offered three reasons for his decision to challenge Jackie Bohanon-McDaniels.  First, he was concerned that she might, as a pastor's wife, exercise undue influence over other members of the jury.  The prosecutor was concerned that if left on the jury she might have undue influence over other jurors, particularly another juror who was a member of her church, but was also concerned more generally about jurors who know one another, since they might be reticent to contradict each other.  1 Ex. B at 65. Furthermore, the prosecutor was concerned that Bohanon-McDaniels might be accorded undue influence by members of the jury who did not previously know her, simply because of the elevated standing with which religious leaders and their families are sometimes regarded.  *Id.* at 64-65.  The prosecutor argued that he wanted leadership on the jury to derive from the force of arguments rather than from status in the broader community.  *Id.* at 65.

The prosecutor also expressed concern about Bohanon-McDaniels' status as the mother of a party involved in pending litigation against the Oakland Police Department.  He felt that since members of the Oakland Police Department were alleged to have done something to her son, she would be distrustful of the police.  *Id.* at 66.

The prosecutor also suspected that Bohanon-McDaniels was not completely forthcoming in her responses.  *Id.* at 66-67.  She did not spell out the role that her son played in the case against the Oakland Police, so the prosecutor could not evaluate the extent of any prejudice she might have had against the Department.  *Id.*  He was worried that she might not have been completely truthful.  *Id.* at 67.

The California Court of Appeal found that there was no reason to question the trial court's acceptance of the prosecutor's explanation of this challenge.  Ex. G at 10.

Petitioner contends that the prosecution's second reason for challenging Bohanon-McDaniels, that she might be biased by her son's involvement in litigation against the Oakland Police, is "inherently implausible."  Pet. Mem. 4.  However, unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be

United States District Court

For the Northern District of California

1   deemed race neutral.  Because no racially discriminatory intent is inherent in any of the

2   prosecutor's proffered reasons for this challenge, he satisfied the step requiring a

3   race-neutral explanation.  Accordingly, the court will consider the totality of the facts,

4   including a comparative juror analysis, to evaluate whether this explanation overcomes the

5   inference of discrimination established by the prima facie case.

6        Bohanon-McDaniels exemplified the prosecutor's general concern about unduly

7   influential jury-members.  Not only did she occupy a social role by virtue of which other jury

8   members might accord her some leadership status, but others in the venire were members

9   of a particular community in which Bohanon-McDaniels was in fact influential.  By

10  challenging Bohanon-McDaniels, the prosecutor tried to eliminate this dynamic from the

11  jury.  As petitioner points out, other members of the jury had been leaders in various areas

12  of their lives: Juror number one had served as a military policeman in Vietnam, and juror

13  number twelve once served as a neighborhood watch block captain.  However, these

14  jurors' former roles did not threaten to bring into the jury a potentially distorting dynamic of

15  the sort likely to follow Bohanon-McDaniels.  Though a distorting dynamic between

16  members of Bohanon-McDaniels' church could have been avoided by instead challenging

17  those venire-members who knew her, those challenges would not have addressed the

18  prosecutor's more general concern about other jurors giving her undue deference.  In this

19  light, it was reasonable to challenge Bohanon-McDaniels rather than the other members of

20  her church.  The prosecutor's desire to let the force of argument predominate in the jury

21  room was not a pretextual reason for this challenge.

22       The voir dire of no other venire members revealed a potential conflict with or mistrust

23  of the Oakland Police Department.  Nine years prior to petitioner's trial, juror number nine

24  dated one of the police officers involved in the litigation with Bohanon-McDaniels' son, but

25  the relationship had been fully terminated and did not pose any conflict of interest or raise

26  the prospect of that juror's distrust of the Oakland Police.  Aug. Ex. B at 128-29.  Juror

27  number six stated that her son had once been involved in the criminal justice system and

28  that she had been angry at the prosecutor in that case, but also stated that she thought

**United States District Court**
For the Northern District of California

1   things worked out fine in the end and that the incident had not left her with any feelings that

2   would affect her ability to serve as a juror.  *Id.* at 172-73.  Though Bohanon-McDaniels said

3   that she would separate petitioner's case from her son's civil trial, she did not describe the

4   nature of her son's claims against the Oakland Police, and thereby left open a question as

5   to the nature or extent of any possible prejudice that she might have against them.

6   Because evidence provided by the Oakland Police was central to the prosecution's case in

7   petitioner's trial, striking Bohanon-McDaniels was reasonable trial strategy.  Accordingly,

8   the prosecutor's second and third reasons for this challenge were not pretextual.

9        The prosecutor's proffered race-neutral reasons for this challenge were not

10   pretextual, and so overcome the inference of discrimination established by the prima facie

11   case.  Accordingly, the Court of Appeal's decision to accept the prosecutor's explanation

12   was not an "unreasonable determination of the facts in light of the evidence presented." 28

13   U.S.C. § 2254(d)(2).

14        **E.    Phyllis Bryant**

15        The prosecutor was concerned that Phyllis Bryant wrote "I don't know, not sure" in

16   response to the question asking whether she could follow the rule demanding that a jury

17   convict if they found that the prosecutor had proved the case beyond a reasonable doubt.

18   1 Ex. B at 67.  The prosecutor felt that Bryant's answers to his questions regarding this

19   response were inadequate.  *Id.* at 67-68.  He felt that she tried to pass it off as nothing, or

20   as an oversight, when "for the People, this is the ultimate question."  1 Ex. B at 68.  He said

21   that he was looking for a clear, emphatic, and unambiguous "yes" to that question.  *Id.*

22        Because no racially discriminatory intent is inherent in the prosecutor's proffered

23   reasons for this challenge, he satisfied the step requiring a race-neutral explanation.

24   Accordingly, the court will consider the totality of the facts, including a comparative juror

25   analysis, to evaluate whether this explanation overcomes the inference of discrimination

26   established by the prima facie case.

27   ///

28        The following exchange occurred between Bryant and the prosecutor during voir

United States District Court

For the Northern District of California

1   dire:

2      P: "I'm trying to find out what it was that was tugging at you when you put that
       answer down."

3
       B: "I can follow it.  I don't have a problem with that."
4
       P: "What was going through your mind when you indicated on the
5      questionnaire that you don't know or you're not sure?"

6      B: "I was just reading all of the different questions, you know, understanding
       each one as I read it, and I marked with a question mark at that one."
7
       P: "Do you have any quarrel with the rule that, hey, you got to follow the law
8      and instructions the judge gives you, even if you disagree with it?"

9      B: "No."

10  Aug. Ex. B at 70.  The prosecutor indicated that he received a sense of indifference from

11  Bryant in these responses, even though she ultimately came around to saying that she

12  could follow the law.  Though other jurors made mistakes regarding the questionnaire,

13  these mistakes were corrected during voir dire, and do not indicate indifference on the part

14  of those jurors.  Accordingly, the record provides no reason to find that the prosecutor's

15  proffered reasons for this challenge were pretextual.  The Court of Appeal's decision to

16  accept the prosecutor's explanation for this challenge was not an "unreasonable

17  determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(2).

18      **F.    Hurley Fuller**

19      The prosecutor offered five reasons for his challenge of Hurley Fuller.  First, he was

20  concerned that Fuller's failure to register to vote indicated a lack of participation in civic

21  affairs: "In my judgment, in my experience, jurors that don't care enough to register to vote

22  and vote may not care enough to effectively participate as jurors in another forum that they

23  could participate in government." 1 Ex. B at 68.

24      Second, he was concerned about the lack of detailed explanation on Fuller's

25  questionnaire, and worried that this might indicate a lack of attention to or sloppiness in his

26  responses.  When the court posited that Mr. Fuller might just not have been able to write

27  particularly well, since he answered a number of questions during voir dire, the prosecutor

28  argued that he was still concerned that Mr. Fuller had not been more forthcoming in

1  voluntarily answering them, and that he was concerned about having to pull teeth or "force

2  the issue with him." *Id.* at 70.

3       Third, the prosecutor was concerned that a commitment to moral principles would

4  override Fuller's ability to apply the law properly. *Id.* at 70-71.  During voir dire, the

5  prosecutor and Fuller had the following exchange:

6       P: "On your questionnaire, there was a question that indicated along the lines
        that you have to accept and follow the law as the judge gives it to you and
7       you have to follow the law and the instructions the judge gives to you, even if
        you disagree with them.  And it asks, would you accept and follow the law as
8       instructed by the judge.  And you marked no, and you said moral principals
        [sic].  Do you remember that."

9       HF: "Yes."

10      P: "Tell me what you meant by that."

11
        HF: "Well, I believe sometimes you could be legally right and morally wrong
12      and vice versa.  And if it came between the two, I'd have to go with what I
        morally feel."
13
        P: ". . . my question for you is, if morally you disagreed with one of the rules
14      the judge gave you or a law, would you be able to promise is that you would
        follow it anyway, or could you not?"
15
        HF: "I'm afraid I couldn't promise you that."
16

17  Aug. Ex. B at 60-61.  Even though Fuller promised to follow the law after further

18  questioning by the court, the prosecutor said that he never got a clear answer as to what

19  those moral principles were.  He also reiterated his concern about jurors whose initial

20  response to such a question is a fallback upon their own principles rather than an

21  expression of commitment to follow the law.  1 Ex. B at 71.

22      Fourth, the prosecutor was also concerned about the "rambling" answers that Fuller

23  gave to some questions.  He was concerned that this manner of speaking might make it

24  difficult for Fuller to get along and work productively with other jurors.  *Id.* at 71-72.

25      Fifth, the prosecutor thought that Fuller had an unkempt appearance.  He thought

26  this indicated a lack of respect for the responsibility of serving jury duty.  *Id.* at 71.

27  Petitioner contends that the prosecutor's fifth reason is not race-neutral: "The white

28  prosecutor's dislike of a black person's hair style is too close to racial stereotyping to be

12

**United States District Court**
For the Northern District of California

1    accepted as race neutral."  Pet. Mem. 4-5.  The prosecutor, however, never mentioned

2    Fuller's hair style in his explanation.  In fact, the prosecutor never went into any real detail

3    as to why he thought Fuller appeared unkempt.  The only details in this matter were

4    supplied by the court, who opined that Fuller's hair did not appear to be combed.  1 Ex. B at

5    72.  Despite the lack of specificity in this portion of the prosecutor's explanation, it does not

6    express an inherent discriminatory intent.

7         Because no racially discriminatory intent is inherent in the prosecutor's proffered

8    reasons for this challenge, he satisfied the step requiring a race-neutral explanation.

9    Additionally, petitioner does not challenge the race-neutrality of the first four reasons,

10   though he contends that they are "wholly pretextual."  Pet. Mem. 4.  Accordingly, the court

11   will consider the totality of the facts, including a comparative juror analysis, to evaluate

12   whether this explanation overcomes the inference of discrimination established by the

13   prima facie case.

14        The prosecutor acknowledged that other jurors had not registered to vote.  1 Ex. B at

15   68.  Had a concern about Fuller's failure to register to vote been the prosecutor's only

16   reason for this challenge, it could rightfully be seen as pretextual in light of other jurors'

17   identical failure to register.  However, pretext cannot be inferred upon this reason alone

18   without examining the other proffered reasons.

19        The voir dire record does not provide any reason to believe that any of the jurors

20   were inattentive, sloppy, or not forthcoming in their responses.  Accordingly, the record

21   does not provide any reason to find unreasonable to the state court's determination that the

22   prosecutor's reasons for this strike were not pretextual.

23        As discussed above, the prosecutor also challenged the only other person who

24   raised, during voir dire, the same concerns expressed in the third proffered reason for this

25   challenge – an undispelled sense that the venire-member's moral convictions might

26   override the duty to apply the law as given.  This issue did not arise during voir dire for any

27   members of the jury.  Furthermore, the concern that a venire-member might follow his own

28   principles over the law is legitimate.  Accordingly, the prosecutor's third reason for

1  challenging Fuller was not pretextual.

2       In response to several questions, Fuller gave answers that are notably longer than

3  the answers given by any of the chosen jurors.  In light of this fact, the prosecutor's

4  impression that Fuller answered some questions less directly than he would have liked, and

5  the concern that this style of speaking might make it difficult for other jurors to work with

6  Fuller, were not pretextual.

7       The prosecutor's final reason for this challenge – that Fuller was unkempt – is

8  difficult, if not impossible, to evaluate through a comparative analysis relying simply on the

9  voir dire record.  As with the second proffered reason for this challenge, the record provides

10  no reason for this court to find unreasonable the state court's determination that the

11  prosecution's reason on this matter was not pretextual.

12       The prosecutor's proffered race-neutral reasons for this challenge were not

13  pretextual, and so overcome the inference of discrimination established by the prima facie

14  case.  Accordingly, the Court of Appeal's conclusion was not an "unreasonable

15  determination of the facts in light of the evidence presented."  28 U.S.C. § 2254(d)(2).

16       **G.    Gail Brooks**

17       The prosecutor offered six reasons for his challenge of Gail Brooks.  First, he was

18  concerned that her opposition to the death penalty was an indication that she might be

19  "less prosecution oriented" than people who support the death penalty.  1 Ex. B at 72-73.

20  He stated that this was "not a litmus test, but it certainly is a factor that counts against Miss

21  Brooks when I'm thinking about jurors."  *Id.* at 73.

22       Second, he was concerned that her prior participation in a hung jury would color her

23  expectations as to how the deliberations in this case should unfold.  *Id.*

24       Third, he was concerned that she had been arrested and involved in what she

25  described as a "miscarriage of justice."  *Id.*  He thought that this incident might lead her to

26  identify more with the defendant in this case, since she had been in a position where she

27  was claiming to be innocent against a purportedly false claim.  *Id.*

28       Fourth, he was concerned about a response on her questionnaire indicating that she

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1  believed that African-Americans are treated more harshly than other people in the criminal

2  justice system.  *Id.* at 74.  He worried that she might unduly favor a defendant who is

3  "African-American, to compensate for what she perceives as unfair application of the justice

4  system against African-Americans."  *Id.*

5      Fifth, the prosecutor expressed concern about Brooks' decision-making ability.  *Id.* at

6  74-75.  He derived this concern from her brief marriage and divorce as a teenager.  *Id.* at

7  75.

8      Sixth, and finally, the prosecutor thought that he got some push-back from Brooks

9  on some of his questions, and that they did not have a good rapport.  This concern, he

10  said, derived from the conversation about her early marriage as well as from her answers

11  to his questions about the sufficiency of one witness to prove a fact.  *Id.* at 75-76.

12      Because no racially discriminatory intent is inherent in the prosecutor's proffered

13  reasons for this challenge, he satisfied the step requiring a race-neutral explanation.

14  Additionally, petitioner does not question the race-neutrality of this explanation, contending

15  instead that the prosecutor's reasons were "unreasonable and/or contrary to the trial

16  record."  Pet. Mem. 5.  Accordingly, the court will consider the totality of the facts, including

17  a comparative juror analysis, to evaluate whether this explanation overcomes the inference

18  of discrimination established by the prima facie case.

19      The transcript does not indicate that any of the jurors were asked about their

20  opinions on the death penalty during voir dire.  Nor does the transcript indicate that any of

21  the other jurors mentioned or were asked about their role on a hung jury.  Nor does it

22  indicate that any of the jurors mentioned or were asked about their decision-making ability,

23  and this court can find no interaction in the transcript that would cast doubt upon any of the

24  jurors' ability.  Accordingly, there are no grounds in the record to find unreasonable the

25  California Court of Appeal's acceptance of the trial court's determination that these reasons

26  were not pretextual.

27  ///

28      Petitioner contends that several jurors had friends or relatives who were involved in

United States District Court

For the Northern District of California

the criminal justice system, and that these relationships could easily have led those jurors to identify with the defendant.  Juror number six stated that her son had once been involved in the criminal justice system and that she had been angry at the prosecutor in that case, but also stated that she thought things worked out fine in the end and that the incident had not left her with any feelings that would affect her ability to serve as a juror.  Aug. Ex. B at 172-73.  Juror number eleven had a friend of a friend who was charged with child neglect, and a friend's husband was charged with child sexual abuse.  *Id.* at 125.  Juror number ten's girlfriend's father once had some interaction with the police during an incident with the father's sister.  *Id.* at 137.  However, the basic fact of having a relationship to another person who has interacted with the police or been accused of a crime is not comparable to having actually been accused of and arrested for a crime in a manner that would lead one to describe the incident as a "miscarriage of justice," as happened with Brooks.  The record indicates that Brooks' negative interaction with the criminal justice system may have left her bearing resentment in a manner not clearly evident for the other jurors.  Accordingly, the California Court of Appeal's acceptance of the trial court's determination that this reason was not pretextual was not unreasonable in light of the evidence available to it.

No other juror expressed, during voir dire, convictions similar to Brooks' belief that the criminal justice system treats African-Americans more harshly than other people.  Challenging a venire-member for such a belief is legitimate.  *See United States v. Steele*, 298 F.3d 906, 914 (9th Cir. 2002) (holding that striking African-American juror based on her stated belief that criminal justice system is tainted by racial discrimination was permissible because the challenge was based on the juror's views, not her race).  This reason is not pretextual.

Finally, as the California Court of Appeal noted, from the transcript alone, it is difficult, if not impossible, to clearly evaluate the tone of Brooks' conversations with the prosecutor or the authenticity of the prosecutor's reaction.  However, the transcript does not provide any grounds for holding unreasonable the California Court of Appeal's acceptance of the trial court's determination that this reason was not pretextual.

16

**United States District Court**
For the Northern District of California

1    The prosecutor's proffered race-neutral reasons for this challenge were not

2    pretextual, and so overcome the inference of discrimination established by the prima facie

3    case.  Accordingly, the Court of Appeal's conclusion was not an "unreasonable

4    determination of the facts in light of the evidence presented."  28 U.S.C. § 2254(d)(2).

5      **H. Summary**

6      The totality of facts shows that the California Court of Appeal reasonably accepted

7    the trial court's determination that these challenges were not racially discriminatory.  None

8    of the prosecutor's proffered reasons for the relevant challenges was pretextual.

9    Furthermore, the prosecutor challenged fewer than one-third of the African-Americans in

10   the venire, and several African-Americans remained on the panel as jurors and alternate

11   jurors, even though the prosecutor still held ten peremptory strikes.  The claim of racial

12   discrimination in jury selection is without merit.

13   **II. Prosecutorial Misconduct**

14     Petitioner contends that the prosecutor misstated the law during closing argument,

15   and that in doing so he violated petitioner's right to due process under the Fourteenth

16   Amendment.  This claim is without merit.

17     **A. Legal Standard**

18     "On a petition for habeas corpus, the standard of review for a claim of prosecutorial

19   misconduct is "the narrow one of due process, and not the broad exercise of supervisory

20   power."" *Darden v. Wainwright*, 477 U.S. 168, 181 (quoting *Donnelly v. DeChristoforo*, 416

21   U.S. 637, 642 (1974)).  A defendant's right to due process is violated when a prosecutor's

22   misconduct renders the trial fundamentally unfair.  *Id.*  Under *Darden*, the first issue is

23   whether the prosecutor's remarks were improper; the next question is whether the improper

24   remarks, if any, infected the trial with unfairness.  *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th

25   Cir.  2005).  Under *Brecht v. Abrahamson*, 507 U.S. 619 (1993), habeas petitioners are not

26   entitled to relief based on trial error unless they can establish that it resulted in actual

27   prejudice.

28     A significant factor in determining the prejudicial effects of misconduct is whether the

**United States District Court**

For the Northern District of California

1    trial court issued a curative instruction.  When a curative instruction is issued, a court

2    presumes that the jury followed that instruction and that no due process violation occurred.

3    See *Darden*, 477 U.S. at 182 (the Court condemned egregious, inflammatory comments by

4    the prosecutor but held that the trial was fair since curative actions were taken by the trial

5    judge); *Tan*, 413 F.3d at 1115 ("we presume jurors follow the court's instructions absent

6    extraordinary circumstances").  This presumption may be overcome if there is an

7    "overwhelming probability" that the jury would be unable to disregard evidence and a strong

8    likelihood that the effect of the misconduct would be "devastating" to the defendant.  See

9    *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987); *Tan*, 413 F.3d at 1115-16.

10    **B.    Analysis**

11        At the hospital after he was shot, Milton Peoples told Oakland Police Officer Nishant

12    Joshi that petitioner was one of the shooters.  Ex. A at 18, 2 Ex. B at 275, 344-45, 352-53.

13    Peoples repeated his account to Oakland Police Sergeant Brian Medeiros several times

14    over the next few days.  2 Ex. B at 278-80, 435, 443, 449-50; Ex. D.  However, during the

15    preliminary hearing, Peoples testified that he did not see who shot him, and that the

16    information he gave to police at the hospital was "a bunch of lies."  Ex. A at 10, 17.  At trial,

17    Peoples again testified that he did not see the shooter.  2 Ex. B at 273-74.

18        During closing argument, the prosecutor said, "What is so special about this scene,

19    about what occurred there that night at Highland Hospital between a CAT scan and an

20    intensive care unit?  You've heard the officers talk about how they were careful because

21    they were treating this as a dying declaration and they kind of throw that term around

22    loosely.  But if you think about it, what does that mean?  In law, the term dying declaration

23    has a special place.  There were times when people can say things as they're dying, if

24    they're describing what it is, who shot them, or what happened to them, and they could die

25    –."  5 Ex. B at 1003.

26    ///

27        At this point trial counsel interjected, "I'm going to object to this as the law.  This is

28    not part of the case."  *Id.*

United States District Court

For the Northern District of California

1    The trial court said, "Overruled.  I'm going to give the law."  *Id.*

2    The prosecutor continued, "They can die and yet those statements still can come

3    into court, and that's what we mean by the classic dying declaration.  But what does it

4    mean to say something is a dying declaration?  It's a basic understanding that when people

5    are on their death bed and that they are basically contemplating their own death, that

6    people tend to bare their souls and be truthful as opposed to being something else, like

7    sneaky or conniving."  *Id.*  at 1003-04.  "These types of moments are very powerful, ladies

8    and gentlemen.  In real life they are very, very powerful.  And these types of moments have

9    the force of truth behind them.  In that moment, Milton Peoples provided the most

10   convincing evidence."  *Id.* at 1005.

11   During his closing argument, petitioner's counsel said, "We've all seen it on TV,

12   dying declarations.  Where have we ever heard about those things? They're allowed in as

13   evidence but you decide the, the jury decides the weight . . . .  The evidence: In effect

14   there is no evidence about a dying declaration being more believable than a nondying

15   declaration.  And the evidence here is really unclear on that."  6 Ex. B at 1079.

16   In rebuttal, the prosecutor argued that Peoples gave false testimony because he

17   wanted petitioner to be acquitted so that Peoples could have petitioner killed on the street.

18   *Id.* at 1098.

19   Petitioner contends that "the prosecutor's argument improperly urged the jury to find

20   that Peoples' "dying declarations" were more legally significant and thus more believable."

21   Pet. Mem. 6.  Because much of the case turned on the jury's regard for the credibility of

22   Peoples' different statements, petitioner argues that there is a reasonable likelihood that the

23   jury convicted him "not because they believed Peoples was telling the truth when he

24   incriminated petitioner, but because they believed that those incriminating statements had a

25   greater legal significance."  *Id.*

26   ///

27   In response to this contention, the California Court of Appeal wrote:

28   Plainly the thrust of the prosecutor's argument was that Peoples intended to

United States District Court

For the Northern District of California

speak the truth when he believed he was on the verge of death.  By referring to the "special place" of a dying declaration, the prosecutor did not state or imply that there is a rule of law requiring the jury to accept or to presume the truth of such a statement.  The argument was intended to convince the jury that it should accept the truth of Peoples' hospital statements because the circumstances under which those statements were made indicated that they in fact were more credible than Peoples' contrary testimony.  In so arguing, the prosecutor made reference to the very factors that have convinced the courts that such statements are sufficiently reliable to be received in evidence despite the absence of cross-examination (E.g., *Mattox v. U.S.* (1895) 156 U.S. 237, 244; *People v. Watson* (2003) 114 Cal.App.4th 142, 153).  That was fair argument (see *People v. Buchtel* (1963) 221 Cal.App.2d 397, 403) and certainly did not tell the jury that any rule of law required it to treat the prosecution's evidence more favorably than the contrary evidence offered by the defense.

Ex. G at 15.  These comments were made as arguments about the relative credibility of Peoples' statements, and they did not imply that there is a legal rule requiring that Peoples' statements at the hospital be accepted.

In any case, petitioner did not suffer prejudice from the prosecutor's conduct.  As the California Court of Appeal pointed out, the court gave instructions that are inconsistent with the suggestion that some of the evidence presented should receive more weight than any other evidence.  *See, e.g.*, CALJIC 2.20 ("You are the sole judges of the believability of a witness and the weight to be given the testimony of each witness"); CALJIC 2.27 ("You should give the testimony of a single witness whatever weight you think it deserves"); CALJIC 2.81 ("In determining the weight to be given to an opinion expressed by any witness who did not testify as an expert witness, you should consider his or her believability . . . .  You are not required to accept an opinion but should give it the weight, if any, to which you find it entitled"); CALJIC 2.92 ("In determining the weight to be given eyewitness identification testimony, you should consider the believability of the eyewitness as well as other factors which bear upon the accuracy of the witness's identification of the defendant"). The state court's determination that there is no reasonable likelihood that under these circumstances the jury would have understood the prosecutor's remarks in the manner petitioner contends, Ex. G. at 16-17, is consistent with the presumption that juries follow the instructions the court gives them and that, in the absence of extraordinary circumstances,

1   no prejudice can follow.  *See Darden*, 477 U.S. at 182; *Tan*, 413 F.3d at 1115.

2        The state court's conclusion that the prosecutor could properly argue that the

3   statements Peoples made when he thought he was dying were more credible than

4   statements he made later was neither contrary to, nor an unreasonable application of,

5   clearly established Supreme Court law.

6   **III.     Ineffective Assistance of Counsel**

7        Petitioner contends that his counsel was ineffective in four ways.  He also claims

8   that cumulative prejudice arises from the individual violations.  These claims are without

9   merit.

10       **A.     Legal Standard**

11       A claim of ineffective assistance of counsel is cognizable as a claim of denial of the

12  Sixth Amendment right to counsel, which guarantees not only assistance, but effective

13  assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  The

14  benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so

15  undermined the proper functioning of the adversarial process that the trial cannot be relied

16  upon as having produced a just result.  *Id.*

17       First, the defendant must show that counsel's performance was deficient, that is, that

18  counsel's representation fell below an objective standard of reasonableness.  *Id.* at 688.

19  The relevant inquiry is not what defense counsel could have done, but rather whether the

20  choices made by defense counsel were reasonable.  *Babbitt v. Calderon*, 151 F.3d 1170,

21  1173 (9th Cir. 1998).  Judicial scrutiny of counsel's performance must be highly deferential,

22  and a court must indulge a strong presumption that counsel's conduct falls within the wide

23  range of reasonable professional assistance.  *Strickland*, 466 U.S. at 689.

24       Second, the defendant must show that there is a reasonable probability that, but for

25  counsel's unprofessional errors, the result of the proceeding would have been different; a

26  reasonable probability is a probability sufficient to undermine confidence in the outcome.

27  *Id.* at 694.  Where the defendant is challenging his conviction, the appropriate question is

28  "whether there is a reasonable probability that, absent the errors, the factfinder would have

**United States District Court**

For the Northern District of California

21

United States District Court

For the Northern District of California

1   had a reasonable doubt respecting guilt." *Id.* at 695.

2       The *Strickland* prejudice analysis is complete in itself.  Therefore, there is no need

3   for additional harmless error review pursuant to *Brecht v. Abrahamson*, 507 U.S. 619, 637

4   (1993). See *Avila v. Galaza*, 297 F.3d 911, 918 n.7 (9th Cir. 2002); *Gentry v. Roe*, 320

5   F.3d 891, 902-03 (9th Cir. 2003) (granting habeas petition without applying *Brecht* after

6   finding prejudice under *Strickland*).  It is unnecessary for a federal court considering a

7   habeas ineffective assistance claim to address the prejudice prong of the *Strickland* test if

8   the petitioner cannot even establish the first prong.  *Siripongs v. Calderon*, 133 F.3d 732,

9   737 (9th Cir. 1998).

10       The *Strickland* framework for analyzing ineffective assistance of counsel claims is

11  "clearly established Federal law, as determined by the Supreme Court of the United States"

12  for the purposes of 28 U.S.C. § 2254(d) analysis.  *Williams v. Taylor*, 529 U.S.  362, 405-07

13  (2000).

14          **B.      Failure to Investigate Potentially Exculpatory Evidence**

15       Petitioner contends that trial counsel was ineffective for failing to follow up on

16  statements given to police by Sandra Wilson and Donald Kautz.  Pet. at 13-14.  According

17  to police reports appended to the present petition, Wilson told the police that the getaway

18  car was tan, and Kautz told police it was gray.  Pet. Exs. E-F.  These statements contradict

19  the prosecution's evidence that the shooter was in a burgundy-colored car.

20       A defense attorney has a general duty to make reasonable investigations or to make

21  a reasonable decision that makes particular investigations unnecessary.  *Strickland*, 466

22  U.S. at 691.  For petitioner to establish that his counsel was ineffective under a "failure to

23  investigate" theory, however, he must first establish the essential prerequisite for this claim,

24  namely that counsel indeed did not investigate.  In the absence of evidence that counsel

25  did not investigate, as here, the claim must fail.

26  ///

27       Petitioner attached to his federal petition a declaration stating that trial counsel never

28  attempted to contact these two witnesses, that they were not called to testify, and that

United States District Court

For the Northern District of California

1  petitioner wrote to trial counsel asking why these witnesses were not called to testify.  Pet.

2  Ex. A.  In his traverse, he contends that he included with his state habeas petitions a

3  declaration, a copy of which is attached to the traverse, in which he made the same

4  statements as in the attachment to the federal petition.  Trav. Ex. 2.  Although no such

5  statements are attached to petitioner's state habeas petitions in the record provided by the

6  Attorney General, for purposes of this ruling the court will assume that these statements

7  were before the state courts and thus may properly be considered here.

8       In his federal declaration petitioner says:  "My trial counsel, Mr. Marvin E. Levy,

9  never attempted to contact Sandra Wilson and Donald Kautz and did not interview them,

10  although these witnesses had identified the assailants' vehicle as a gray or tan car, not the

11  burgundy Oldsmobile the prosecution insisted I was in when the crime took place.  These

12  witnesses were not called to testify in my defense."  Pet. Ex. A.  The declaration that

13  petitioner says was attached to his state petitions is very similar, with the cautious addition

14  of "[t]o my knowledge:"  "To my knowledge, my trial counsel, Mr. Marvin E. Levy, never

15  attempted to contact these witnesses and did not interview them."  Trav. Ex. 2.

16       The court will assume that the witnesses, if called, could have testified as petitioner

17  believes.  That does not go to the main factual ground for petitioner's claim, however, which

18  is whether counsel attempted to interview them.  Petitioner qualified his claim in the state

19  declaration with "[t]o my knowledge," and in fact that defines the defect of the declarations,

20  namely that petitioner provides only the conclusory statement that counsel did not attempt

21  to contact them, but provides no details or facts regarding how he came to know this or why

22  he thinks it is true.  In such circumstances, the only reasonable interpretation of the

23  declarations is that petitioner has no reason to believe that counsel *did* contact the

24  witnesses, which is not the same thing as knowing that he did *not*.  In short, petitioner's

25  evidence does not establish that counsel failed to interview these witnesses.

26  ///

27       Furthermore, petitioner has not established that if the witnesses had testified there is

28  a reasonable possibility that the outcome of the trial would have been different.  Petitioner

23

**United States District Court**

For the Northern District of California

1   contends that these witnesses' testimony would have "undermined every aspect of the

2   prosecution's case against petitioner" by verifying Peoples' claim that he lied to the police

3   officers in the hospital when he described the night of the crime.  Pet. Mem. at 12.

4   Respondent, on the other hand, contends that "at best their testimony would have been

5   contradictory and unhelpful." Ans. Mem. at 14.

6        Petitioner's contention that admission of the witnesses' testimony about the color of

7   the shooter's car would have undermined the entire prosecution case is unpersuasive,

8   because Peoples' statement given in the hospital was contradicted by Peoples himself.

9   The minor additional contradiction would not have significantly changed the equation,

10  especially as the two witnesses' statements contradicted themselves.  Even if petitioner

11  had established that counsel did not contact the witnesses, which he has not, he has not

12  shown that the outcome of the trial would have been different had the investigation been

13  made.

14       The state court's denial of this claim was neither contrary to, nor an unreasonable

15  application of, clearly established Supreme Court law.

16       **C.    Unreasonable Use of Alibi Defense**

17       Petitioner contends that trial counsel was ineffective for relying on an alibi defense

18  when counsel knew that the prosecution would call a rebuttal witness and that a falsified

19  alibi would create the likelihood that the court would give the jury an instruction on

20  consciousness of guilt.  This claim is without merit.

21       During pretrial discussions, trial counsel stated that while he had listed Shanda

22  Kennard (petitioner's girlfriend) as a defense witness, he did not intend to call her to testify.

23  1 Ex. B at 48.  The prosecutor told the court and defense counsel that he was placing

24  Kennard on his witness list because "it may be appropriate for me in my case-in-chief to

25  have Miss Kennard testify in an attempt to prove that the defense fabricated an alibi."  1 Ex.

26  B at 49.

27

28       Sedika Cooper was the only witness called by the defense.  Cooper testified that she

24

United States District Court

For the Northern District of California

1   remembered petitioner and Shanda Kennard coming to a residence where Cooper was

2   staying on the night of the crimes.  She also described leaving and returning to the

3   residence, and then leaving again, and testified that at each point, petitioner and Kennard

4   were at the residence. 3 Ex. B at 577-84.  This testimony would have placed petitioner and

5   Kennard at the residence throughout the time when the crime occurred.

6         In rebuttal, the prosecution called Shanda Kennard.  Kennard testified that on the

7   night of the crime she and petitioner went to the residence Cooper described.  4 Ex. B at

8   717.  She also said that the two of them, along with two other young men, left the residence

9   about an hour later, drove to San Francisco, dropped off one of the men, returned to

10  Berkeley to drop off the other young man, and then went to a restaurant in Hayward.  *Id.* at

11  719-21.  She said that after returning to her apartment, she and petitioner remained there

12  for the rest of the night.  *Id.* at 721.

13        The prosecutor then confronted Kennard with a statement she gave to police the day

14  after the crime.  This statement varied from her testimony in several respects, including the

15  times described, the trip to San Francisco, the people they were with and the amount of

16  time she had known petitioner.  *Id.* at 732-55.  The prosecutor then produced another

17  statement Kennard gave to the police, this one from about ten days after the first

18  statement.  This second statement varied from both her testimony and her first statement,

19  again in several respects, including the times described, the trip to San Francisco, and the

20  people they were with.  She also testified that in any case they were not at the residence

21  with Cooper for several hours on the night of the crime.  Additionally, Kennard admitted that

22  she lied to police and under oath at trial.  4 Ex. B at 755 - 5 Ex. B 802.

23        Much of petitioner's claim turns on the contention that the use of a contradicted alibi

24  defense caused the court to give an instruction allowing the jury to infer consciousness of

25  guilt from the falsified alibi.  This contention is not supported by the record.  The only

26  instruction given regarding consciousness of guilt was CALJIC 2.03:

27  ///
            If you find that before this trial the defendant made a willfully false or
28          deliberately misleading statement concerning the crimes for which he is now

**United States District Court**
For the Northern District of California

1
2

> being tried, you may consider that statement as a circumstance tending to
> prove a consciousness of guilt.  However, that conduct is not sufficient by
> itself to prove guilt, and its weight and significant, if any, are for you to decide.

3   Ex. A at 218.  This instruction, by its terms, has no application to false statements by

4   witnesses other than the defendant.  The discussion about whether to give this instruction

5   focused upon the jury's ability to consider petitioner's own statements to police prior to trial,

6   rather than upon the jury's consideration of the conflicting alibi testimony given at trial by

7   Cooper and Kennard.  5 Ex. B at 922-926.  No special jury instruction resulted from the use

8   of this alibi defense.  The conflicting testimony of these two witnesses was subject to the

9   same credibility determinations that the jury was required to make of all evidence presented

10  at trial.

11       Though trial counsel knew that the prosecution would call a rebuttal witness, he

12  may, for example, have been hoping that the jury would simply grant credibility to Cooper's

13  testimony.  Petitioner has not made a showing sufficient to undermine the strong

14  presumption that counsel's trial tactics were reasonable at the time.  Again, the fact that

15  petitioner can describe a scenario in which trial counsel's choices seem questionable does

16  not imply that those choices fall below an objective standard of reasonableness.  This is

17  particularly so where the imagined scenario is not supported by the record.

18       The state court's denial of this claim was neither contrary to nor an unreasonable

19  application of, clearly established Supreme Court law.

20       **D.       Failure to Object in Closing Argument**

21       Petitioner contends that his counsel was ineffective for failing to object to two

22  instances of allegedly-improper closing argument by the prosecutor.  The claim is without

23  merit.

24       First, petitioner points to the following portion of the prosecution's closing statement:

25
26

> But the law anticipates these situations because I've got to tell you, its not an
> uncommon situation, especially for murders in Oakland.

27
28

> And you're going to get an instruction about this very topic.  And what this
> instruction says is when there is evidence that at some other time, before
> court, a witness has made a statement that is inconsistent with the testimony

1   here in court, you may consider that evidence as evidence of the truth of what
    was said on that prior occasion.

2

3   What the law is saying is, you know what? Yeah, a person can come to court
    and say, I didn't see nothing, it was all a lie. But what the law says is you can

4   consider these prior statements of Milton Peoples, and all of them, on the
    tape, to Officer Joshi, to Deputy District Attorney Lim, and you get to consider
    them for the truth which is what they are.

5

6   So it doesn't matter that somebody, you know, a witness has said something
    repeatedly to the police and then it comes time for the day of trial and just

7   because a witness comes in here and says oh, no, I didn't see that, that was
    a lie, that's not the end of the story. We don't just throw in the towel because

8   they come in here and say under oath, oh, I didn't see nothing, at least not
    when there's every reason to believe that when they say I didn't see nothing,
    that that change in the story is not believable.

9

10  This is not an uncommon occurrence. And sadly, in many cases here if every
    time someone came into court and said oh, I didn't see it, I don't know, I didn't

11  tell the police that, if the law wasn't set up this way, there wouldn't be many
    prosecutions in Oakland. I'll tell you that much.

12  Pet. at 17-18; 6 RT at 1026-27.

13         Petitioner contends that the prosecutor improperly argued facts derived from his own

14  knowledge but not introduced as evidence. This is true, but counsel's failure to object was

15  not prejudicial.

16         Among the applicable instructions given by the trial court were CALJIC 1.02

17  ("Statements made by the attorneys during the trial are not evidence"); CALJIC 2.13

18  ("Evidence that at some other time a witness made a statement or statements that is or are

19  inconsistent or consistent with his or her testimony in this trial, may be considered by you

20  not only for the purpose of testing the credibility of the witness, but also as evidence of the

21  truth of the facts stated by the witness on that former occasion"); CALJIC 2.20 ("You are

22  the sole judges of the believability of a witness and the weight to be given to the testimony

23  of each witness"); CALJIC 2.21.2 ("You may reject the whole testimony of a witness who

24  willfully has testified falsely as to a material point, unless, from all evidence, you believe the

25  probability of truth favors his or her testimony in other particulars"); CALJIC 2.22 ("The final

26  test . . . is the convincing force of the evidence"). The jury is presumed to have followed

27  the court's instructions. *Darden*, 477 U.S. at 182. Given these instructions, the

28  prosecutor's statement could not have affected the verdict, so counsel's failure to object to

27

United States District Court

For the Northern District of California

1    it was not prejudicial.  There was no Sixth Amendment violation as to this incident.

2        Petitioner also points to this portion of the prosecutor's closing argument:

3    "[Petitioner] knows that a drive-by is a very effective way to kill, does not leave witnesses

4    generally, usually doesn't even leave the live witness like Milton Peoples in the car."  Pet. at

5    18; 6 RT at 1117.  Petitioner contends that the prosecutor improperly argued that petitioner

6    had prior knowledge about the effectiveness of drive-by shootings, when no evidence about

7    such knowledge was introduced during the trial.

8        Prosecutorial comment must be examined in context.  *United States v. Robinson*,

9    485 U.S. 25, 33 (1988).  The prosecutor's second statement was made in the context of his

10   presentation of his theory of the case, and is surrounded by statements explicitly

11   characterized as hypotheses, in which the prosecutor asks the jury to consider what might

12   have been going through petitioner's mind during the crime and in his interactions with

13   police in the days afterwards.

14       Although this comment characterizes petitioner in a light favorable to the

15   prosecution's case, it is not a positive statement about his criminal record, as petitioner

16   contends.  Even if the remark in question is understood as ambiguous, "a court should not

17   lightly infer that a prosecutor intends an ambiguous remark to have its most damaging

18   meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the

19   plethora of less damaging interpretations."  *Donnelley v. DeChristoforo*, 416 U.S. 637, 647

20   (1974).

21       The statement was not improper, so counsel's failure to object was not deficient

22   performance.  Furthermore, for the reasons discussed above, the trial court's instructions to

23   the jury to consider only the evidence and that the arguments of counsel are not evidence

24   means that any failure to object did not prejudice petitioner.

25       The rejections of these claims by the state appellate courts were not contrary to, or

26   an unreasonable application of, clearly-established United States Supreme Court authority.

27   ///

28       **E.    Failure to Request Jury Instruction**

28

**United States District Court**

For the Northern District of California

1    Petitioner contends that trial counsel was ineffective for failing to request an

2    instruction that Milton Peoples' statements to police at the hospital were not admitted into

3    evidence as dying declarations.   Defense counsel chose to engage in closing argument

4    the prosecution's comments about the credibility of Peoples' statements at the hospital.  As

5    the California Court of Appeal put it, "the final arguments of both sides focused the jury's

6    attention on the need to evaluate the credibility of the conflicting statements made by

7    Peoples at different times, without any suggestion that a rule of law or evidentiary standard

8    required that the statements made by Peoples at the hospital were entitled to greater

9    consideration than any other evidence." Ex. G at 16.  Trial counsel's attempt to discount

10   the prosecutor's argument about Peoples' credibility in closing argument rather than in a

11   jury instruction does not fall below an objective standard of reasonableness, and is the type

12   of choice that the *Strickland* standard is designed to protect.  *See Strickland*, 466 U.S. at

13   689.  Consequently, the state court's denial of this claim was neither contrary to, nor an

14   unreasonable application of, clearly established Supreme Court law.

15       **F.    Cumulative Prejudice**

16       Petitioner alleges cumulative prejudice arising from deficient performance of

17   counsel.  Where there is no constitutional error, there is to accumulate. *Mancuso v.*

18   *Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002).  Because counsel here was not deficient in

19   performance, there is nothing to accumulate.

20       In addition, even if it is assumed that counsel was deficient as to failure to

21   investigate and failure to object in closing argument, the combined effects of those

22   assumed errors would not be sufficient to show prejudice, partly because of the weakness

23   of the proposed witnesses' testimony about the color of the shooter's car, and partly

24   because the trial court's instructions prevented any significant prejudice from any

25   prosecutorial misconduct in closing argument.

26   ///

27   ///

28

1

2                                  **CONCLUSION**

3          For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**.  The

4    clerk shall close the file.

5          **IT IS SO ORDERED.**

6    Dated:  September 10 , 2009.          _____
                                                        PHYLLIS J. HAMILTON
7                                                       United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
     G:\PRO-SE\PJH\HC.06\CHARLES568.RUL.wpd

**United States District Court**
For the Northern District of California